CITY OF READING, APPELLANT, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Reading v. Pub. Util. Comm.,*
109 Ohio St.3d 193, 2006-Ohio-2181.]

(No. 2005–0245—Submitted January 11, 2006—Decided May 17, 2006.)

MOYER, C.J.

Background

{¶ 1} This is an appeal as of right by appellant, the city of Reading, from an order of the Public Utilities Commission of Ohio in *In the Matter of the Petition of Indiana & Ohio Railroad, Inc. to Close to Vehicular Traffic the Vorhees Street Crossing in the City of Reading, Hamilton County, Ohio,* case No. 02–589–RR–UNC, 2003 WL 23415030 (Oct. 13, 2004). The Indiana & Ohio Railroad, Inc. was the petitioner, and Reading was an intervening party at the commission. The railroad has intervened as an appellee. The Ohio Municipal League has filed an amicus brief in support of Reading, and the Ohio Railroad Association has filed an amicus brief in support of the commission and the railroad.

{¶ 2} Reading is an Ohio municipality with an area of approximately three and one-half square miles. Reading is divided in half by the Oasis line of railroad track, which extends 16 miles, from north of Reading in Evendale and south through Reading to the Ohio River in downtown Cincinnati. Through most of

Reading, the Oasis line runs parallel to the major north-south road in Reading, known as Reading Road or U.S. Route 42. There are eight public railroad grade crossings in Reading located within a distance of 6,800 feet (approximately 1.3 miles), including the subject of this appeal, the Vorhees Street crossing.

{¶ 3} In 2002, the railroad filed a petition with the commission pursuant to R.C. 4907.474 to close the grade crossing at Vorhees Street in Reading. Vorhees Street is a two-block-long, two-lane-wide street that runs east to west and intersects the Oasis line. There are three businesses located west of the Vorhees crossing and three homes east of the crossing. These businesses and houses are accessible by other nearby crossings.

{¶ 4} Reading opposed the closing of the Vorhees crossing, and a public hearing was held in Reading pursuant to R.C. 4907.474(B). An evidentiary hearing was later held before the commission.

{¶ 5} The railroad presented evidence to the commission that the crossing was a severe safety hazard. The crossing had previously been the site of a vehicle-train accident. In addition, the physical characteristics of the crossing made it particularly vulnerable to a collision. A steep grade on both sides of the crossing and a blind curve on the tracks limit visibility for cars and pedestrians. Because of the steep grade, tractor-trailers and other heavy vehicles continually get hung up on the crossing and are unable to dislodge without being towed.

{¶ 6} In October 2004, the commission issued its order finding that there was "not a demonstrable need" for the Vorhees crossing, granting the railroad's petition, and directing Reading to close the Vorhees crossing to all vehicular and pedestrian traffic.

{¶ 7} On rehearing, the commission clarified that the railroad would be responsible for the cost of closing the grade crossing. The commission's order was affirmed in all other respects. Reading timely filed its notice of appeal.

## Introduction

{¶ 8} The sole issue raised in this appeal is whether R.C. 4907.474 violates Section 3, Article XVIII of the Ohio Constitution, commonly known as the Home Rule Amendment. The parties agree that Reading has properly preserved a facial constitutional challenge to R.C. 4907.474. Reading further maintained during oral argument that it had preserved a constitutional challenge to R.C. 4907.474 as it has been applied in this case. Thus, we will address this issue first.

## Specifying Constitutional Errors for Appeal

{¶ 9} During oral argument, Reading claimed that it had raised an "as applied" constitutional challenge to R.C. 4907.474 on three separate occasions before the

commission: prior to the evidentiary hearing, in its posthearing brief, and in its application for rehearing.

{¶ 10} In each instance, Reading's sole reference to any constitutional claim is contained in a footnote. For example, Reading states in one footnote:

{¶ 11} "The City specifically reserves its right to argue that R.C. 4907.474 may be unconstitutional, either facially or as applied, as a violation of the City's 'Home Rule' authority granted by, *inter alia*, Article XVIII, Sections 3 and 4 of the Ohio Constitution."

{¶ 12} In *Atwood Resources, Inc. v. Pub. Util. Comm.* (1989), 43 Ohio St.3d 96, 100–101, 538 N.E.2d 1049, we held that a constitutional claim was not properly before us because the appellant, Atwood, had failed to comply with the specificity requirements of R.C. 4903.10. Additionally, we noted that elevating a question to constitutional proportions does not necessarily allow the matter to be raised initially in this court. Where extrinsic facts are required to properly resolve the issue, the error must be specified at the first available opportunity. Id. at 101, 538 N.E.2d 1049, citing *Cleveland Gear Co. v. Limbach* (1988), 35 Ohio St.3d 229, 520 N.E.2d 188. See, also, *Akron v. Pub. Util. Comm.* (1978), 55 Ohio St.2d 155, 161–162, 9 O.O.3d 122, 378 N.E.2d 480; *Agin v. Pub. Util. Comm.* (1967), 12 Ohio St.2d 97, 97–99, 41 O.O.2d 406, 232 N.E.2d 828.

{¶ 13} In *Atwood*, we cited *Cleveland Gear*, 35 Ohio St.3d 229, 520 N.E.2d 188, which held that the question of whether a tax statute is unconstitutional on its face may be raised initially in the Supreme Court although not previously raised before the Board of Tax Appeals. Id., paragraph two of the syllabus. We recognized that the Board of Tax Appeals, as an administrative agency, may not declare a statute unconstitutional. Id., paragraph one of the syllabus. Nevertheless, we held that when a statute is challenged on the basis that it is unconstitutional as applied to a particular state of facts, that challenge must be raised before the board in order to develop a factual record. Id., paragraph three of the syllabus.

{¶ 14} While *Cleveland Gear* involved tax appeals, the rationale of the decision is applicable to appeals from the commission. The commission, similar to the Board of Tax Appeals, is an administrative agency with powers specifically granted by the Revised Code, and it has no authority to declare a statute unconstitutional. See, e.g., *Panhandle E. Pipe Line Co. v. Pub. Util. Comm.* (1978), 56 Ohio St.2d 334, 346, 10 O.O.3d 452, 383 N.E.2d 1163.

{¶ 15} The commission is statutorily authorized to receive evidence in its role as fact-finder. See R.C. 4903.09. Extrinsic facts are not needed to determine whether a statute is unconstitutional on its face. When a party challenges the constitutionality of a statute as applied to a specific set of facts, however, a record is required. The proponent of the constitutionality of a statute also needs notice

and an opportunity to develop an evidentiary record to support that view. See *Cleveland Gear*, 35 Ohio St.3d at 232, 520 N.E.2d 188.

{¶ 16} For these reasons, we hold that a *facial* constitutional challenge to a statute need not first be raised before the commission. However, a litigant must raise an *as-applied* constitutional challenge in the first instance during the proceedings before the commission in order to allow the parties to develop an evidentiary record.

{¶ 17} In the instant case, Reading failed to raise an as-applied constitutional challenge to R.C. 4907.474 before the commission. Reading's reservation in a footnote of a right to raise the issue is not the same as actually raising the issue. In no instance before the commission did Reading actually raise any constitutional challenge to R.C. 4907.474.

{¶ 18} Even if we were to find that Reading's reservation of this right sufficed, Reading failed to present any evidence at the commission that would support its contention that R.C. 4907.474 is unconstitutional in its application. The burden is on the party making the challenge to present clear and convincing evidence of existing facts that make the statute unconstitutional and void when applied. *Cleveland Gear*, 35 Ohio St.3d at 231, 520 N.E.2d 188, citing *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629, paragraph six of the syllabus. Yet Reading's evidence before the commission was directed solely to whether the Vorhees crossing should be closed according to the criteria set forth in R.C. 4907.474, not to whether the statute was constitutionally infirm. Therefore, we find that Reading has preserved only a facial constitutional challenge to R.C. 4907.474.

## Constitutionality of R.C. 4907.474

{¶ 19} Under R.C. 4907.474, the commission is authorized to close a municipal railroad grade crossing to vehicular and pedestrian traffic and divert travel to other crossings. The section provides:

{¶ 20} "(A) In making the survey provided for by section 4907.471 of the Revised Code, the public utilities commission shall determine as to each crossing whether there is a demonstrable need for such crossing to exist and whether the crossing could be closed to vehicular traffic, or to pedestrian traffic, or to both, and the travel over the crossing diverted to other crossings."

{¶ 21} In deciding whether the crossing should be closed under R.C. 4907.474, the commission is required to survey and rank the danger presented by the crossing. See R.C. 4907.471. The commission must also consider a number of factors, such as how the closing would affect traffic flow and access for emergency vehicles, the feasibility and convenience of alternate routes, safety issues at

alternate crossings, and other factors pertinent to municipal corporations. R.C. 4907.474(A)(1) through (9).

{¶ 22} Reading claims that R.C. 4907.474 is unconstitutional because it violates Section 3, Article XVIII of the Ohio Constitution. This section provides:

{¶ 23} "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 24} Reading contends that the power to regulate and control its streets and rights of way is a function of local self-government reserved exclusively to municipalities under the Ohio Constitution. Reading equates the closing of a municipal railroad grade crossing to the closure or vacation of a city street. Because R.C. 4907.474 delegates authority to the commission to close a municipal street at a railroad grade crossing, Reading argues that the statute directly conflicts with the city's powers of self-government under Section 3, Article XVIII of the Ohio Constitution.

{¶ 25} A statute is entitled to a strong presumption of constitutionality. *Ottawa Cty. Bd. of Commrs. v. Marblehead* (1999), 86 Ohio St.3d 43, 46, 711 N.E.2d 663; *N. Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St.2d 375, 377, 15 O.O.3d 450, 402 N.E.2d 519. Thus, Reading must rebut the presumption of constitutionality that attaches to R.C. 4907.474. For the following reasons, we conclude that Reading has failed to overcome that presumption.

{¶ 26} First, R.C. 4907.474 does not infringe on Reading's powers of local self-government, because it does not authorize the commission to close or vacate a city street. By its very terms, R.C. 4907.474 merely authorizes the commission to close a municipal railroad grade crossing and divert travel to other crossings when "there is no demonstrable need for such crossing to exist."

{¶ 27} In making this determination, R.C. 4907.474 requires the commission to weigh the impact the closing would have on the local community by considering, among other things, how it would affect vehicular traffic at the crossing to be closed and any alternate crossings, the number of alternate routes, and the impact that closure would have on emergency vehicles, commercial enterprises, and other factors pertinent to municipal corporations. See R.C. 4907.474(A)(7) through (9).

{¶ 28} Because R.C. 4907.474 requires the commission to consider these and other factors before ordering that a crossing be closed, rather than authorizing the commission to close a municipal street entirely to vehicular and pedestrian traffic, the statute actually prevents such an occurrence. In fact, the evidence before the commission indicated that Vorhees Street will remain open to vehicu-

lar and pedestrian traffic on both sides of the closed crossing and accessible via alternate routes.

{¶ 29} Even if we were to find that R.C. 4907.474 infringes on Reading's local Home Rule powers over its streets, the statute would not necessarily be unconstitutional. We have held that "a statute that limits the municipality's power is not unconstitutional if the purpose of the statute is an exercise of the state's police powers and is not a substantial infringement upon the municipality's authority." *Marblehead*, 86 Ohio St.3d at 44–45, 711 N.E.2d 663. See, also, *Columbus v. Teater* (1978), 53 Ohio St.2d 253, 260–261, 7 O.O.3d 410, 374 N.E.2d 154, and *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 68, 73 O.O.2d 285, 337 N.E.2d 766.

{¶ 30} R.C. 4907.474 is a valid exercise of the state's police powers. It promotes the health, safety, and welfare of the public by ensuring that unsafe and unnecessary railroad grade crossings are closed to vehicular and pedestrian traffic. Moreover, the impact of the statute on a municipality's authority to regulate and control its streets and rights of way is minimal because the municipality still retains broad powers and duties with respect to streets within its limits.

{¶ 31} Notwithstanding, Reading asserts that the constitutional power implicated in this case involves its powers of self-government under Section 3, Article XVIII of the Ohio Constitution and that therefore its powers of self-government take precedence over laws, such as R.C. 4907.474, passed by the General Assembly, that attempt to regulate and control municipal streets and rights of way.

{¶ 32} Reading is correct that the requirement in Section 3, Article XVIII that municipal regulations must not conflict with general laws is not intended as a restriction on the substantive powers of local self-government. See *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted* (1992), 65 Ohio St.3d 242, 244, 602 N.E.2d 1147; *Ohio Assn. of Pub. School Emps., Chapter No. 471 v. Twinsburg* (1988), 36 Ohio St.3d 180, 522 N.E.2d 532. However, we have never held that the powers of local self-government under Section 3 are unlimited.

{¶ 33} Instead, we have stated, "It is a fundamental principle of Ohio law that, pursuant to the 'statewide concern' doctrine, a municipality may not, in the regulation of local matters, infringe on matters of general and statewide concern." *State ex rel. Evans v. Moore* (1982), 69 Ohio St.2d 88, 89–90, 23 O.O.3d 145, 431 N.E.2d 311. The doctrine of statewide concern was cogently stated in *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 129, 44 O.O.2d 121, 239 N.E.2d 75, in which we held that the "power granted under Section 3 of Article XVIII relates to local matters and even in the regulation of such local matters a

municipality may not infringe on matters of general and statewide concern." We have consistently upheld this principle.[1]

{¶ 34} We conclude that the subject matter of R.C. 4907.474 transcends the boundaries of a municipality. See *Twinsburg*, 36 Ohio St.3d at 184, 522 N.E.2d 532, citing *Whitman*, 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766, and *Teater*, 53 Ohio St.2d 253, 7 O.O.3d 410, 374 N.E.2d 154, as cases where the statewide-concern doctrine was appropriately applied. The General Assembly has created a comprehensive, statewide regulatory scheme vesting authority with the commission to declare railroad grade crossings dangerous and unnecessary and to act accordingly. R.C. 4907.471(A) requires the commission to survey all public railroad grade crossings, including those within municipal corporations, determine the probability of accidents at each crossing, and rank each crossing as to its presentation of danger. In conjunction with the R.C. 4907.471 survey, R.C. 4907.474, the statute at issue here, authorizes the commission to determine "whether there is a demonstrable need for such crossing to exist and whether the crossing should be closed." See, also, 4907.475 (closing of rural grade crossings).

{¶ 35} Moreover, as an issue related to railroad safety, the matter is not solely of statewide concern, but one of national importance as well. Under the Federal Railroad Safety Act, "[l]aws, regulations, and orders related to railroad safety * * * shall be nationally uniform to the extent practicable." Section 20106, Title 49, U.S.Code. Holding that municipalities throughout Ohio have the power to decide which railroad grade crossings should be closed would not advance the uniform regulation of railroad safety. In fact, regulation of municipal grade crossing closings by each political subdivision of this state would directly conflict with the uniform regulation envisioned by the United States Congress and the Ohio General Assembly.

{¶ 36} Based on the foregoing, we hold that Reading has failed to show that application of R.C. 4907.474 substantially interferes with its power of self-government. The closing of railroad crossings is a matter of statewide concern and is not a power of *local* self-government reserved to municipalities under their Home Rule powers.

---

1. See *State ex rel. Evans v. Moore*, 69 Ohio St.2d 88, 90, 23 O.O.3d 145, 431 N.E.2d 311 (prevailing-wage law superseded local wage regulation); *State ex rel. Villari v. Bedford Hts.* (1984), 11 Ohio St.3d 222, 225, 11 OBR 537, 465 N.E.2d 64, overruled on other grounds (calculation of employee benefits); *State ex rel. Adkins v. Sobb* (1986), 26 Ohio St.3d 46, 48, 26 OBR 39, 496 N.E.2d 994 (vacation-leave credits); *Beachwood v. Cuyahoga Cty. Bd. of Elections* (1958), 167 Ohio St. 369, 371, 5 O.O.2d 6, 148 N.E.2d 921 (detachment proceeding). Cf. *Ohio Assn. of Pub. School Emps., Chapter 471 v. Twinsburg*, 36 Ohio St.3d 180, 182, 522 N.E.2d 532, and *State Personnel Bd. of Rev. v. Bay Village* (1986), 28 Ohio St.3d 214, 217, 28 OBR 298, 503 N.E.2d 518, acknowledging that the statewide-concern doctrine applies to matters of local self-government, but holding that ordinances did not implicate matters of statewide concern.

Conclusion

{¶ 37} We affirm the order of the commission.

Order affirmed.

RESNICK, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

PFEIFER, J., concurs in judgment only.

---

Chester, Willcox and Saxbe, L.L.P., Todd M. Rodgers, John W. Bentine, Sarah Daggett Morrison, and Stephen C. Fitch, for appellant.

Jim Petro, Attorney General, and Duane W. Luckey, William L. Wright, and Steve L. Beeler, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Porter, Wright, Morris & Arthur, L.L.P., Carl A. Aveni II, R. Leland Evans, and Anne M. Hughes, for intervening appellee, Indiana & Ohio Railroad, Inc.

Byron & Byron Co., L.P.A., Barry M. Byron, and Stephen L. Byron; John Gotherman, urging reversal for amicus curiae Ohio Municipal Leage.

Gallagher, Sharp, Fulton & Norman and Joseph J. Santoro, urging affirmance for amicus curiae Ohio Railroad Association.